T.C. Memo. 1997-47


UNITED STATES TAX COURT


UTILICORP UNITED, INC. & SUBSIDIARIES, F.K.A.
MISSOURI PUBLIC SERVICE CO., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8563-94.                    Filed January 27, 1997.


        S, a subsidiary of P, purchased certain of the
assets of a reconstructed hydroelectric power facility
and immediately leased those assets back to the seller.
R determined that S should have allocated a portion of
the asset purchase price to goodwill or going concern
value.  P contends that a reallocation is inappropriate
because S acquired no going concern value or goodwill.
        <u>Held</u>:  P has proven that the fair market value of
the listed assets acquired by S, which did not include
going concern value or goodwill, equaled or exceeded
the price paid for them; therefore, S need not allocate
any portion of that purchase price to goodwill or going
concern value.

James G. Kreissman, Michael H. Simonson, and Naftali Z. Dembitzer, for petitioner.

Peter J. Graziano and Pamela L. Cohen, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  Petitioner Utilicorp United, Inc. (petitioner) is the common parent corporation of an affiliated group of corporations making a consolidated return of income (the affiliated group).  Respondent has determined deficiencies of $2,462,443 and $229,479 in the consolidated Federal taxable income of the affiliated group for the group's 1984 and 1987 taxable (calendar) years, respectively.  The only issue remaining for decision is the depreciable basis of certain assets. Respondent has determined that one member of the affiliated group, Utilicorp, Inc. (UtilCo), improperly included in the depreciable basis of certain property the nondepreciable cost of goodwill or going concern value.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

## Introduction

Some facts have been stipulated and are so found.  The stipulations of fact filed by the parties and accompanying exhibits are incorporated herein by this reference.

Petitioner is a Delaware corporation with its principal place of business in Kansas City, Missouri.

On December 17, 1987, UtilCo entered into a sale-leaseback transaction with a Minnesota limited partnership, Topsham Hydro Partners Limited Partnership (THP).  THP owned a hydroelectric facility in Topsham and Brunswick, Maine, on the Androscoggin River, at the Pejepscot Mill Dam (the hydroelectric facility).  UtilCo purchased an undivided 50-percent interest in certain assets (including real property) constituting the hydroelectric facility (the undivided interest) and immediately thereafter leased the undivided interest back to THP.  Chrysler Capital Corp. (Chrysler Capital) simultaneously purchased (and leased back) the remaining undivided interest.

## History of the Facility

### Androscoggin Water Power Company

The Pejepscot Mill Dam originally was owned by a Maine corporation, the Androscoggin Water Power Co. (AWP).  In 1982, AWP obtained a license from the Federal Energy Regulatory Commission (FERC) to construct a hydroelectric generating facility at the dam.  In furtherance of that project, among other actions, AWP entered into contracts for reconstruction of the

site (the construction contracts) and negotiated a power purchase agreement with Central Maine Power Co. (CMP).

Construction Contracts

The construction contracts included (1) an agreement with Cianbro Corp. (Cianbro) for general construction and the installation of equipment, (2) an agreement with Allis-Chalmers Corp. (Allis-Chalmers) for a turbine/generator and related equipment, and (3) an agreement with Acres International Corp. (Acres) for design and engineering services.

None of the construction contracts entitles AWP to a complete and working hydroelectric generating facility. In particular, Acres was only responsible for (1) preliminary engineering of the facility, (2) determining the total project cost, (3) final design of the facility, including the creation of detailed construction drawings, and (4) management of the construction process. Acres was not obligated to deliver to AWP a functional facility. Acres did not function as a general contractor for the construction of the facility. The only warranties provided by Allis-Chalmers and Cianbro were that the work that those companies performed would conform to the requirements of their respective contracts and would be free from defects in design, workmanship, materials, and/or performance. Cianbro and Allis-Chalmers did not guarantee each other's work. The prices charged by Allis-Chalmers and Cianbro were not fixed and were subject to increases or decreases in the event those

contractors were required to make changes in the amount of work that they had to perform.

### Power Purchase Agreement

AWP and CMP entered into the power purchase agreement on June 25, 1984, and amended it on June 17, 1985 (as so amended, the power purchase agreement). Pursuant to the power purchase agreement, CMP agreed to purchase the electrical output of the hydroelectric facility for 15 years and obtained an option to purchase such output for an additional 5 years. The power purchase agreement expressly provided that it would terminate if CMP did not receive electricity from the hydroelectric facility by September 1, 1988. The rates provided by the power purchase agreement were market rates.

### THP Acquires AWP and Completes the Hydroelectric Facility

THP was formed in 1985. In June 1985, THP acquired all of the shares of stock of AWP for $10.5 million. At that time, AWP had sold no electricity and had no paid employees. AWP assigned its rights and obligations under the power purchase agreement and the construction contracts to THP. The power purchase agreement was not significant to THP's decision to purchase AWP, since the power purchase agreement was a market rate contract and there was a risk that it might expire before construction of the hydroelectric facility was completed. AWP's FERC license was transferred to THP. On February 10, 1986, AWP was liquidated and its assets distributed to THP.

In June 1985, THP commenced reconstruction of the hydroelectric facility.  Over the next 2-1/2 years, THP made substantial alterations to the properties acquired from AWP. During that period, THP assumed various construction risks, including labor strikes, unforeseen delays and costs, and physical damage.  Personnel employed by THP managed the completion of construction.  THP paid a total of $48.2 million to acquire the stock in AWP and to complete the reconstruction of the hydroelectric facility.  The hydroelectric facility was synchronized with CMP, and THP began furnishing electric power to CMP on October 31, 1987.

UnderlineUtilCo Acquisition and Lease

### Purchase of Undivided Interest

On December 17, 1987, UtilCo purchased the undivided interest from THP for $32,250,000.  UtilCo immediately leased the undivided interest back to THP for a 15-year term pursuant to Project Lease Agreement No. 2, dated December 1, 1987 (the project lease).  Under the terms of the project lease, THP has, at the end of that 15-year term, the option of either extending the lease term or repurchasing the undivided interest.  UtilCo effected its purchase and lease of the undivided interest through the Meridian Trust Co., which, pursuant to a trust agreement, purchased the undivided interest on behalf of UtilCo. (Hereafter, we shall disregard Meridian's role and consider UtilCo  as owning directly the undivided interest.)

### The Bill of Sale

The document evidencing the purchase of the undivided interest by UtilCo was Warranty Deed and Bill of Sale No. 2, dated December 15, 1987 (the bill of sale). The bill of sale sets forth with particularity the assets that were acquired by UtilCo pursuant to the bill of sale (the bill of sale assets). The bill of sale assets consist of (1) the land upon which the hydroelectric facility was constructed, (2) the flowage rights appurtenant to that land, (3) certain easements appurtenant to that land (excluding the previously referenced flowage rights), (4) the structures located on that land, and (5) the equipment comprising the hydroelectric facility.

### FERC License

The FERC license was not specifically identified in the bill of sale or the schedules attached thereto as an asset to be transferred to UtilCo. FERC requires that owners of hydroelectric facilities become colicensees for such facilities, regardless of whether those owners perform significant services with respect to the ownership or management of the facility. On November 6, 1987, FERC issued an order transferring the license for the hydroelectric facility from THP alone to THP, UtilCo, and Chrysler Capital as colicensees.

### Operating Agreement

As part of the sale-leaseback, UtilCo entered into an operating agreement with THP.

Security for Lease Payments

The bill of sale does not provide for a sale by THP of its interest in the power purchase agreement or the construction contracts. THP assigned its rights under the power purchase agreement and the construction contracts to UtilCo to secure the payment of rents by THP under the project lease.

Purchase Price Allocation

In making its purchase price allocation, UtilCo allocated the $32,250,000 purchase price among the bill of sale assets. After consummating its purchase of the undivided interest, UtilCo calculated its investment tax credit, business energy tax credit, and depreciation for the 1987 taxable year, using that purchase price allocation. Because UtilCo could not use all of its general business credit in the 1987 taxable year, a portion of that credit was carried back to the 1984 taxable year. UtilCo did not record any goodwill or going concern value on its books as a result of the acquisition of the undivided interest.

Expert Testimony

Petitioner's Expert

Petitioner presented the expert testimony of David C. Moody, vice president of Stone & Webster Management Consultants, Inc. Mr. Moody is licensed in the State of Maine as a professional engineer and as a real estate appraiser. Mr. Moody is

experienced in the appraisal of all kinds of utility properties, including hydroelectric plants.  Mr. Moody has opinions as to the market values of (1) the bill of sale assets and (2) an undivided 50-percent interest therein.  He is of the opinion that, as of December 17, 1987, the market values of the bill of sale assets and of an undivided 50-percent interest therein were $65,000,000 and $32,500,000, respectively.

Mr. Moody arrived at his opinions by determining the reproduction cost of the bill of sale assets to be $64,879,102. He also applied an earnings analysis to the income stream that the bill of sale assets (in conjunction with certain other assets of THP) could have been expected to produce.  He determined that the present value of such income stream was $73,261,609.

Mr. Moody determined the reproduction cost of the bill of sale assets as follows:

| | |
|---|---|
| Cost of AWP stock | $10,500,000 |
| New construction | 28,566,497 |
| Subtotal | 39,066,497 |
| Turnkey fee (15%) | 5,860,000 |
| Other costs[1] | 9,142,605 |
| Total construction costs | 54,069,102 |
| Developer's profit (20%) | 10,810,000 |
| Total cost indicator | $64,879,102 |

[1]Construction interest, financing, and legal costs, administrative and general costs, and contingency costs.

Mr. Moody applied his earnings analysis by considering an estimate of annual net operating income, which was adjusted for income tax considerations and then discounted to present value using an after-tax discount rate of 10.55 percent.

Mr. Moody reconciled the difference in result between his two valuation approaches by assigning virtually all of the excess under his earnings analysis to certain business assets, such as the right to receive payments under the power purchase agreement, retained by THP.

Respondent's Expert

Respondent presented the expert testimony of Richard H. Knoll, senior consultant, Business Valuation Services, Inc. Mr. Knoll is experienced in the valuation of assets, operating entities, and proprietary technologies in the fields of petroleum refining, chemical processing, food processing, pharmaceuticals, and related fields. Mr. Knoll is licensed as an engineer in the State of Illinois. Mr. Knoll has opinions as to the market values of UtilCo's undivided 50-percent interest in (1) all of the assets that he believed were acquired by UtilCo and Chrysler Capital and (2) only the tangible assets acquired by UtilCo and Chrysler Capital. He is of the opinion that the market values of such interests at December 17, 1987, were $32,250,000 and $20,650,008, respectively.

In part, Mr. Knoll arrived at his opinions by determining the replacement cost of the real and personal property purchased

by THP. He determined replacement cost by adding to the actual cost of that property an entrepreneurial profit of 13 percent. A 13-percent allowance for entrepreneurial profit was considered reasonable by Mr. Knoll because it represented the weighted-average cost of capital of UtilCo at the time of the sale-leaseback transaction. Mr. Knoll determined that the "acquisition cost/rehabilitation cost of a 50% interest to THP was approximately $24,000,000." Mr. Knoll also applied an income approach, which involved determining the present value of UtilCo's after tax cash flows (including residual value), using a discount rate of 13 percent. Taking into account that present value, he determined that the value of UtilCo's undivided 50-percent interest in all of the assets that he believed were acquired by UtilCo and Chrysler Capital was $34,538,942 as of December 17, 1987. In arriving at his opinion that the market value of UtilCo's undivided interest was $32,250,000, Mr. Knoll assumed that UtilCo enjoyed some negotiating advantage over THP.

Mr. Knoll assumed that the difference between the $32,250,000 value of UtilCo's undivided interest and his determination of the tangible asset value using the cost approach ($24,000,000) was due to UtilCo's acquisition of intangible assets. Mr. Knoll concluded:

> The fair market value of the Project largely relates to its proposed power sale under the prenegotiated PPA, [power purchase agreement] the leasing of the Facility under the Participation Agreement, the guarantee of tax savings under the Tax Indemnity Agreement, guaranteed

use of the FERC license, guaranteed use of the required easements near the Facility and going concern value, in addition to the tangible value associated with the Facility's personal property and operating assets.

In pertinent part, Mr. Knoll's "Total Project Cost Allocation" was as follows:

| | |
|---|---:|
| Personal property | $12,856,365 |
| Real estate improvements | 28,425,492 |
| Real estate-unimproved | 18,159 |
| Total tangibles | 41,300,016 |
| Intangibles | |
| Flowage rights | |
| Easement | |
| Permits/licenses | |
| Collateralization of power purchase agreement | |
| Participation agreement | |
| Tax indemnity agreement | |
| Project lease | |
| Security deposit agreement | |
| Other intangibles | |
| Total intangibles | 23,199,984 |
| Fair Market Value of Total Assets | 64,500,000 |

Mr. Knoll was unable to ascribe any particular value to any intangible asset.  In his opinion, "it is nearly impossible to quantify a single element of intangible value."

OPINION

I.  Introduction

Petitioner has assigned error to respondent's determination that the purchase price paid by UtilCo for its undivided 50-percent interest (the undivided interest) in certain of the assets constituting the hydroelectric facility located at the Pejepscot Mill Dam, on the Androscoggin River, in the State of

Maine (the hydroelectric facility), should in part be reallocated to either goodwill or going concern value. At trial, respondent conceded that, if there was any goodwill, it was "very small or nothing". We accept that statement as a concession by respondent that UtilCo did not acquire goodwill. Thus, we shall limit our inquiry to the question of whether UtilCo acquired going concern value. Also at trial, the parties agreed that the Court, as an initial matter, should determine the fair market value of the assets listed in Warranty Deed and Bill of Sale No. 2 (the bill of sale assets). We have found that UtilCo acquired an undivided 50-percent interest in the bill of sale assets. Going concern value is <u>not</u> one of the bill of sale assets. Respondent concedes that, if the fair market value of the bill of sale assets was at least $65,000,000, then UtilCo acquired <u>no</u> going concern value.[1] As set forth below, we find that the value of the bill of sale assets was $65,000,000. Accordingly, we find that UtilCo

---

[1]     Where assets are purchased and the fair market value of assets other than goodwill or going concern value equals or exceeds the purchase price, goodwill or going concern value is not generally attributable to the purchase price. See, e.g., <u>UFE, Inc. v. Commissioner</u>, 92 T.C. 1314, 1328 (1989); <u>Citizens & Southern Corp. v. Commissioner</u>, 91 T.C. 463, 511-512 (1988), affd. 919 F.2d 1492 (11th Cir. 1990). Sec. 1060 provides special allocation rules for certain asset acquisitions. Under the residual method described in sec. 1.1060-1T(d), Temporary Income Tax Regs., 53 Fed. Reg. 27040 (July 18, 1988), consideration is first allocated among cash and other items, including both tangible and intangible property (but not intangibles in the nature of goodwill and going concern value), before being allocated to goodwill and going concern value.

acquired no going concern value, and we sustain petitioner's assignment of error.

II. Testimony

A. Reliance on Expert Testimony

Both petitioner and respondent rely heavily, if not exclusively, on expert testimony to establish fair market value. As its expert witness as to valuation, petitioner called David C. Moody. As her expert witness as to valuation, respondent called Richard H. Knoll. Messrs. Moody and Knoll each provided a written report, which were both admitted into evidence. Like the parties, we rely heavily on expert testimony in making our finding as to the value of the bill of sale assets. We found Mr. Moody to be convincing, and we agree with his conclusion as to the value of the bill of sale assets. We had difficulty with the testimony of Mr. Knoll, who, in any event, did not have an opinion as to the amount of going concern value allegedly acquired by UtilCo. We were not persuaded by his testimony and do not accept his conclusions as to value. We shall set forth some of our reasons for agreeing with Mr. Moody and disagreeing with Mr. Knoll.

B. David C. Moody

Mr. Moody is licensed in the State of Maine as an engineer and as a real estate appraiser. He is experienced in the appraisal of electric and water utility properties, including hydroelectric plants. Like Mr. Knoll, Mr. Moody rejected a

comparable sales approach as inappropriate to the circumstances in this case and relied on both a cost and earnings approach to determine value. He identified the properties that he was appraising as the bill of sale assets. He determined the reproduction cost of the bill of sale assets to be $64,879,102, but, taking into account the results of his income analysis, concluded that the fair market value of the hydroelectric facility was $65,000,000. We are not troubled by that discrepancy. Mr. Moody did not assign any value to going concern value.

Respondent's criticism of Mr. Moody's opinions focuses on his determination that the reproduction cost of the bill of sale assets was $64,879,102. Respondent quarrels with inclusion of a 15 percent turnkey fee of $5,860,000 and a 20 percent developer's profit of $10,810,000. Apparently, respondent does not disagree that the remaining acquisition and construction costs of the bill of sale assets were $48,209,102. Indeed, respondent's expert, Mr. Knoll, was of the opinion that the "overall construction price" paid by THP was $48,200,000.

In his report, Mr. Moody states that, although THP had contracted for construction of the facility, it was not guaranteed a complete working hydroelectric facility at the completion of construction. He states that the owners bore the risk of nonperformance of the various contractors, as well as the cost of unforeseen difficulties such as bad weather, floods,

subsurface geotechnical problems, or start-up problems.
Mr. Moody states that those risks could have been alleviated by
hiring an overseer of the entire process who would be in charge
of delivering a completed, operating facility.  He refers to that
risk of delivering a completed, operating facility as the
"turnkey risk", and he states that contractors who take on a
turnkey risk charge a premium, which is typically 15 percent.

If THP bore a turnkey risk in connection with construction
of the facility, then the addition of a turnkey premium in
determining the value of the bill of sale assets is appropriate.
See Miami Valley Broadcasting Corp. v. Commissioner, 204 Ct. Cl.
582, 499 F.2d 677, 680 (1974) (turnkey premium appropriate in
valuing a fully operational plant received on dissolution of a
corporation).  We have found that none of the construction
contracts entitled AWP (or its successor by assignment, THP) to a
complete and working hydroelectric generating facility.  AWP and
then its assignee, THP, bore the ultimate risk that the facility
would not function when completed.  Notwithstanding respondent's
argument to the contrary, we are persuaded that THP bore a
turnkey risk in connection with the construction of the facility,
and we so find.  We must determine whether the inclusion of the
15-percent turnkey premium in Mr. Moody's valuation of the bill
of sale assets was appropriate.

In determining an appropriate turnkey fee, Mr. Moody
consulted employees of Stone & Webster Engineering Corp.

That corporation enters into turnkey contracts to build hydroelectric power facilities. Based on those conversations, Mr. Moody concluded that contractors that enter into agreements to deliver fully functional hydroelectric power facilities typically charge a turnkey premium equal to 15-percent of the funds expended in constructing the facility in question. Respondent asserts that a 15-percent turnkey fee is excessive. Respondent supports that assertion with Mr. Knoll's testimony. Mr. Knoll's experience with turnkey contracts, however, is limited to three turnkey contracts involving the construction of assets to be used in the petrochemical industry. Mr. Knoll apparently has no experience in determining appropriate turnkey fees applicable to contracts calling for the construction of assets to be used in the hydroelectric power industry. We find that Mr. Moody was a more credible witness than Mr. Knoll. We have no reason to believe that Mr. Moody overstated the turnkey fee, and we accept his determination and calculation of that fee.

Respondent questions the amount of, rather than the necessity of, a developer's profit allowance. Indeed, Mr. Knoll factors into his own analysis a developer's profit of 13 percent. Respondent also argues that Mr. Moody erred by including both a turnkey fee and a developer's profit in computing the reproduction cost of the facility. Respondent cites no authority prohibiting both a turnkey fee and a developer's profit, and petitioner has convinced us that the two address different

economic risks.  The turnkey risk is the risk inherent in promising a working facility.  The developer's profit represents the risk inherent in constructing a facility that cannot be sold for the price asked by the developer.  Insofar as the turnkey fee and the developer's profit address different components of reproduction cost, we see no logical reason why they cannot coexist.  We are persuaded that, in the instant case, the turnkey fee and the developer's profit figure represent different components of the reproduction cost of the bill of sale assets and that it was appropriate for Mr. Moody to include both of those figures in the reproduction cost of those assets.  We now turn to Mr. Moody's computation of the developer's profit.

In calculating a developer's profit, Mr. Moody looked to conditions encountered by persons selling hydroelectric generating assets in the northeastern United States in December 1987.  Mr. Moody determined that an appropriate range for a developer's profit was 20 to 25 percent; Mr. Moody applied a developer's profit of 20 percent.  We do not believe that Mr. Moody overstated the developer's profit, and we accept his calculation of that profit figure.

C.  Richard K. Knoll

Mr. Knoll's written report is coauthored by Martin D. Hanan; neither Mr. Knoll nor Mr. Hanan is licensed as an appraiser. Mr. Knoll testified that his recent professional focus has been in the valuation of intangible assets and intellectual property.

We conclude that Mr. Knoll has limited experience in valuing hydroelectric generating facilities.

Mr. Knoll's valuation is not limited to the bill of sale assets, and his written report is inconsistent in describing exactly what his valuation assignment was:  e.g., "50% undivided interest * * * in the Topsham Hydroelectric Project", "50% undivided interest in [the sale leaseback transaction]", "50% undivided interest in the assets purchased by UtilCo".  Moreover, Mr. Knoll has no opinion as to the value of the bill of sale assets per se.  He is of the opinion that the market value of UtilCo's undivided 50 percent interest in the tangible assets acquired by UtilCo and Chrysler Capital was $20,650,008.  He has not explained how he squares that figure with the statement in his report that the "acquisition cost/rehabilitation cost of a 50% interest to THP was approximately $24,000,000."

We are troubled that Mr. Knoll's calculation of entrepreneurial profit is idiosyncratic.  Mr. Knoll considered a 13-percent allowance for entrepreneurial profit reasonable because it represented the weighted-average cost of capital of UtilCo at the time of the sale-leaseback transaction.  He testified that, if UtilCo's weighted-average cost of capital changed, that would change his estimate of the appropriate percentage of entrepreneurial profit.  He testified that if there were a different buyer, with a different cost of capital, that might change his entrepreneurial profit allowance.  In neither

his written report nor his oral testimony did Mr. Knoll state that he performed any market analysis or interviewed any developers to determine the expectations of profit required to undertake a project such as the hydroelectric facility.

Although Mr. Knoll is of the opinion that at least a portion of the difference between UtilCo's purchase price of $32,500,000 and the $24,000,000 "acquisition cost/rehabilitation cost" is attributable to going concern value, he has no opinion as to what that portion is, except as an inseparable portion of the value of a package of at least nine intangibles, including flowage rights and easements. His opinion that UtilCo acquired going concern value is of no help to us because he is unable to distinguish the going concern value from the value of other intangible assets, such as flowage rights and easements that are specifically set forth as bill of sale assets.

Mr. Knoll testified in rebuttal to Mr. Moody. His rebuttal testimony failed to persuade us that Mr. Moody made any error in arriving at his opinion as to the fair market value of the bill of sale assets.

III. Conclusion

We find that the fair market value of the bill of sale assets was $65,000,000. As a result, we conclude that UtilCo acquired no going concern value. We sustain petitioner's assignment of error.

Decision will be entered
under Rule 155.